## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **JUAN WOODROFFE individually and on Behalf of the JUAN F. WOODROFFE RETIREMENT PLAN**<br>**Plaintiff,**<br>**v.**<br><br>**SANTANDER SECURITIES, LLC**<br>**Defendant** | Civil No. 2020-cv-01659 |

## COMPLAINT

Plaintiff Juan Woodroffe individually and on Behalf of the Juan F. Woodroffe Retirement Plan ("Plaintiff," "Woodroffe," or "Plan") brings this action against Santander Securities, LLC (hereinafter "Santander" or "Defendant") to recover for losses caused by Santander's breaches of its agreements, responsibilities, and duties. Based on personal knowledge and information obtained from investigation by counsel, Plaintiff alleges as follows:

### THE PARTIES

1.      Plaintiff Juan Woodroffe is a resident of Puerto Rico.

2.      Plaintiff established and was a participant in Juan F. Woodroffe Retirement Plan ("Plan") during the relevant time period.

3.      Defendant Santander Securities, LLC (hereinafter "Santander" or "Defendant") is a corporation with its principal place of business in Dorchester,

1

Massachusetts. Thus, Santander is a citizen of Massachusetts.

4.      Santander (FINRA CRD# 41791) (SEC# 8-49571) was registered with the Financial Industry Regulatory Authority, United States Securities and Exchange Commission ("SEC") and the Commissioner of Financial Institutions of Puerto Rico, as a securities broker-dealer.

5.      Santander is also a member of the Financial Industry Regulatory Authority (FINRA) and other national securities exchanges and self-regulatory organizations ("SROs").

6.      As part of its membership in FINRA, Santander agreed to abide by and comply with the rules and regulations of FINRA for the benefit of customers like Plaintiff.

7.      Santander is a subsidiary of Banco Santander, S.A., which was at one time the 43rd largest company in the world, with total assets in excess of $1.2 trillion.

8.      Santander also has various affiliates, including Santander Asset Management.

9.      Santander employed Hortensia Llavat (hereinafter "Llavat or "Financial Advisor" as its agent.

10.      Numerous additional current and/or former Santander Employees and Agents were also responsible for the violations, failures, or directly participated in or have knowledge of the violations described herein, including but not limited to:

2

   a.  Fernando Batlle

   b.  Lawrence "Larry" Carter

   c.  Beatriz Luna

   d.  John Watson

   e.  Ana Suarez

   f.  Juan Carlos Batlle

## JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

12.    Venue is proper in this district because Plaintiff resides in this District, Defendant conduct business in this District, and substantial acts which caused the harm complained of herein emanated from activities in this District.

## FACTUAL ALLEGATIONS

13.    Santander, as a FINRA Member and regulated entity, had a duty and responsibility to comply with the securities laws, rules, and regulations.

14.    Santander agreed with FINRA that it would comply with the securities rules and regulations.

15.    Santander agreed with FINRA that it would maintain high standards of commercial honor and just and equitable principles of trade.

16.    Santander is subject to the laws and regulations of the United States,

the Commonwealth of Puerto Rico, FINRA, the SEC and other SROs, as well as its own internal rules, policies, and procedures.

17.    Santander and Llavat were subject to the requirement that "Every broker-dealer, issuer, investment adviser, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser, agent or any other person subject to the provisions of the Act, must observe the highest standard of fiduciary duty toward their customers and investors." *See* Reg. No. 6078, Sec. 25.1 (Jan. 18, 2000).

18.    Santander was a fiduciary to Juan Woodroffe.

19.    Santander was a fiduciary to the Juan F. Woodroffe Retirement Plan.

20.    Santander had a duty to act in Plaintiff's best interest.

21.    Santander had a duty to place Plaintiff's interests first.

22.    Plaintiff's Financial Advisor was Hortensia Llavat who was employed in Santander's Puerto Rico offices.

23.    Llavat was an agent of Santander.

24.    Llavat was a fiduciary to Juan Woodroffe.

25.    Llavat was a fiduciary to the Juan F. Woodroffe Retirement Plan.

26.    Santander was the primary underwriter of various non-exchange traded closed-end and open-end funds ("Santander Funds").[1] The Santander Funds were

---

[1] Santander frequently referred to these funds as the First Puerto Rico Family of Funds or the TAR-SAN Funds.

marketed by Santander as bond funds that offered substantial income with minimal risk. In soliciting clients such as Plaintiff to buy and/or hold the Santander Funds, Santander represented that they were safe, secure investments that offered income without high risk. In reality, these funds carried profound risks and were unsuitable for Claimant, particularly in the amounts recommended to Claimant.

27.    The Santander Fund's touted their investment objectives as being "consistent with the preservation of capital."

28.    The Santander Funds were illiquid or had limited liquidity.

29.    The Santander Funds they were heavily invested in esoteric bonds with significant risk. Those risks were compounded by the use of leverage.

30.    The Santander Funds were distributed, sponsored, administered, and advised by Santander and/or its affiliates.

31.    Santander employees serve on the board of directors of the Santander Funds. Furthermore, Santander and its affiliates were underwriters and dealer, or placement agent, for the Santander Funds, and Santander received compensation for acting as such.

32.    The Santander Funds were a significant source of revenue for Santander and its affiliates.

33.    Santander had a profound financial interest in selling the Santander Funds to its clients and in preventing its clients from selling their shares.

34.     Because of Santander's deep relationship with issuers of Puerto Rican debt, Santander was well aware of the risks of investing heavily in Puerto Rican debt – and the risks of investing in funds composed of such debt.

35.     However, despite internally recognizing the increasing risks of Puerto Rican investments, Santander did not update or review its proprietary risk-classification tool – the "Securities Master" program – to account for the increasing likelihood that the risks of investing in Puerto Rican bonds would materialize.

36.     Santander was acutely aware of those changing risks, as demonstrated by Santander's development of its plan to eliminate its own exposure to Puerto Rican debt as the risk level increased.

37.     The composition and structure of the Santander Funds, in particular, the use of significant amounts of leverage, magnified these risks for those holding positions in the Santander Funds.

38.     Santander inadequately supervised its Financial Advisors by failing to assess the impact of concentrated positions on customers, in relation to their purchases of the Santander Funds and other Puerto Rican securities.

39.     The Santander Funds were riskier and were more opaque than typical municipal bond funds because the Santander Funds are not traded on an exchange or quoted on any quotation service, and further, they are not registered with the Securities and Exchange Commission ("SEC").

40.    The Santander Funds used leverage to increase their holdings in Puerto Rican securities – they borrowed money to purchase even more Puerto Rican securities than the funds' net assets, which significantly increased risk to investors.

41.    Santander earned advisory fees for its management of the funds. Because the funds' advisory fees are charged as a percentage of the total assets under management, the use of leverage served to increase the management fees earned by Santander.  Consequently, the use of leverage increased the risk to fund investors, while it also increased the fees earned by Santander – a very clear conflict of interest between Santander and fund investors.

42.    The Santander Funds were even more atypical municipal bond funds because they were heavily concentrated in the bonds of specific Puerto Rican issuers. For instance, the Santander Funds had heavy concentrations in the Puerto Rico Government Development Bank ("GDB"), Puerto Rican Sales Tax Financing Corp ("COFINA"), the Employees Retirement System ("ERS"), Puerto Rico Trade & Export, and the Puerto Rico Public Building Authority.

43.    Santander served as a major underwriter of Puerto Rican debt, underwriting billions of dollars of Puerto Rico bonds from 2000-2012.

44.    Santander has been one of the top underwriters for PR municipal debt, and it has played a role in most major debt financings in recent history.

45.    On December 16, 2016, an industry watchdog released a scathing

article detailing the results of a study it performed regarding Santander's conflicted role in municipal financing and in helping to create the current municipal debt crisis in Puerto Rico.[2] The authors of the report noted that two brothers, Juan Carlos Batlle and Fernando Batlle, alternately headed up Santander Securities and the Puerto Rico Government Development Bank (GDB) over the last several years, each alternately taking turns as heads of each organization, "creating a virtual revolving door of brothers." *Id.* Of course, "[t]he GDB is bank, fiscal agent and acts as financial advisor for the Commonwealth of Puerto Rico, and its instrumentalities (public corporations and municipalities) in connection with all their borrowings. All such borrowings are subject to approval by GDB. The GDB also selects bond underwriters in connection with issuing bonds." *Id.* The authors of the study examined "90 [Puerto Rican] debt deals that Santander participated in underwriting, from general obligation bonds to the extra-constitutional COFINA bonds, to the GDB's affiliates and subsidiaries." *Id.* The authors "found the total amount of the debt issued where Santander played an underwriting role to be $61.2 billion dollars—almost as much as the figure currently used as an estimate of the Commonwealth's total outstanding debt load of more than $70 billion. More than $1 billion from these bond deals went to fees paid to Santander and other banks." *Id.*

---

[2] *See* "PIRATES OF THE CARIBBEAN: HOW SANTANDER'S REVOLVING DOOR WITH PUERTO RICO'S DEVELOPMENT BANK EXACERBATED A FISCAL CATASTROPHE FOR THE PUERTO RICAN PEOPLE", available at: http://hedgeclippers.org/pirates-of-the-caribbean-how-santanders-revolving-door-with-puerto-ricos-development-bank-exacerbated-a-fiscal-catastrophe-for-the-puerto-rican-people/

Indeed, not only did Santander serve an underwriting role in over $61.2 billion in PR financings, but in over $18.3 billion of these deals, Santander served as either lead or co-lead underwriter. *Id.* The deals on which Santander served as lead or co-lead underwriter resulted in fees of over $236 million. *Id.* The authors conclude that "[a] crushing debt burden was placed on the Puerto Rican people with the assistance of bankers like Santander—making economic growth for the island almost impossible without some debt cancellation. Santander advised, structured and arranged much of this debt . . . . Too much of the debt Santander underwrote was questionable or underwritten when the bank had conflicted relationships with the government." *Id.*

46.    Santander was a major underwriter of Puerto Rican debt, routinely ranking among the highest in volume of negotiated senior managed transactions for the Commonwealth of Puerto Rico. Santander acted as Lead Manager or Co-Lead Manager in many local municipal financing transactions. As part of its role in the underwriting, Santander regularly agreed to purchase and to distribute the underwritten securities. Not only did Santander charge fees to underwrite Puerto Rican bonds, but Santander then packaged these bonds into its own Santander Funds and charged retail investors a "front end load" of 4.5 % and annual fees.

47.    Santander placed many of the bonds it underwrote in its own proprietary Santander Funds.

48.     Santander also served as adviser or co-adviser to each of the Santander Funds. Santander received compensation for its roles with the Santander Funds.

49.     In addition, the Santander Funds' Boards of Directors was largely composed of Santander employees.  This structure allowed Santander to direct which Bonds the Santander Funds would purchase. Effectively, this presented Santander with a way to build a market for the bonds it underwrote and to unload bonds it no longer wanted to hold in Santander's inventory.

50.     Santander's conflicts of interest with its customers were exacerbated because the firm controlled almost the entire market for the Santander Funds, and investors could not go to another broker-dealer to sell their shares. While most closed-end bond funds are traded on an exchange or over the counter, Santander comprised virtually the entire market for many of the funds. Transactions could only occur between Santander and its clients (principal trades) or between two different Santander clients that Santander facilitated (so-called riskless principal trades). The Funds' liquidity was inextricably intertwined with Santander's multiple roles. This limited market made the Santander Closed-End Funds inherently illiquid and put investors at the mercy of Santander if they wanted to sell their shares. Customers had to compete with Santander to sell shares in a market that Santander dominated and controlled. This additional conflict and illiquidity continues today, as many investors are experiencing significant difficulties when trying to sell their shares at

a reasonable price. Furthermore, the lack of an open market also means Santander is in charge of pricing the Santander Funds, as no service independently prices the Santander Funds or tracks their trading.

51.    On information and belief, Santander frequently made firm commitments to purchase the bonds it underwrote.

52.    Since at least 2006, Puerto Rico has been in a recession. The Puerto Rican economy has been struggling with low growth, high unemployment, rising debt, and a declining population, tax base, tourism and GDP, as well as a host of other macroeconomic problems.

53.    Throughout 2012 and 2013 the risks in the Puerto Rico bond market increased dramatically.

54.    In 2012, Santander internally recognized that the risks of holding Puerto Rican credit were rapidly materializing.

55.    Santander knew that many of its clients were heavily concentrated in Puerto Rican securities.

56.    Santander knew that Plaintiff's account was heavily concentrated in Puerto Rican holdings.

57.    In fact, many hundreds of Santander's clients were significantly concentrated in Puerto Rican Securities.

58.    Santander recommended many of its clients concentrate their accounts

in PR Securities.

59.    Santander knew it owed ongoing obligations to Plaintiff and its other customers like Plaintiff.

60.    Santander had an obligation to monitor Plaintiff's investment portfolio on a regular basis.

61.    Rather than advising Plaintiff to sell or diversify, Santander instead acted to protect its own interests by liquidating its inventory of Puerto Rican debt (i.g., its own holdings), while leaving Plaintiff in the dark.

62.    Santander exercised this course of conduct upon Plaintiff and many of its other clients.

63.    Santander created a concerted and intentional plan to reduce its own exposure to Puerto Rican credit before the investments lost significant value, leaving its customers to bear these losses.

64.    In the fall of 2012, right before the Puerto Rican securities' dramatic and devastating decline, Santander implemented its plan; it stopped purchasing Puerto Rican bonds in its own inventory and began rapidly liquidating its inventory of Puerto Rican bonds.

65.    By October 2013, Santander had entirely eliminated its own Puerto Rican bond inventory.

66.    Even worse, not only did Santander protect itself by selling its own

Puerto Rican debt holdings without advising its customers that they should do the same, but Santander simultaneously pushed these same Puerto Rican investments on its own customers.

67.     Plaintiff was one such customer as Santander sold Plaintiff a Santander Fund out of Santander's own internal inventory in January 2013 while Santander was actively dumping its inventory in Puerto Rico related securities.

68.     A FINRA investigation found that, during the same time period in which Santander dumped its own Puerto Rican inventory, Santander solicited its Puerto Rican clients to purchase approximately $180 million in Puerto Rican bonds and over $101 million in Puerto Rican Closed-end Funds ("CEFs") – funds which were composed of these same Puerto Rican bonds.

69.     FINRA ultimately fined Santander $6.4 million for its conduct. (*See* Exhibit A, FINRA Acceptance, Waiver, and Consent.)

70.     Santander and its affiliated entities had material conflicts of interests, failed to provide objective and independent advice, and breached their statutory fiduciary duties.

71.     Plaintiff's portfolio did not conform to well-accepted industry principles such as asset allocation and diversification.

72.     Plaintiff needlessly suffered losses because Santander mishandled the assets Plaintiff entrusted to Santander's care by investing those assets in

geographically concentrated positions with unjustifiable risk.

73.    Plaintiff relied upon Santander to provide sound financial advice and asset management.

74.    Unfortunately, rather than prudently investing the Claimant's assets in a well-diversified portfolio, Santander concentrated those assets in Puerto Rican holdings, including Puerto Rican Funds, including Closed-End Funds (CEFs) and Open-End Funds (OEFs) and Puerto Rico related securities.

75.    Many of the Funds sold to Claimant were proprietary Santander Funds (e.g., the First Puerto Rico Family of Funds).

76.    The Santander Funds were leveraged funds that consisted of geographically concentrated, high-risk esoteric bonds.

77.    The Santander Funds were high risk investments.

78.    As the risks of a concentrated portfolio of Puerto Rican securities increased, Santander concealed those increased risks from its clients, including Plaintiff.

79.    At the same time, Santander recommended to those same clients, including Plaintiff, that they continue to hold increasingly risky Puerto Rican debt.

80.    Santander employed this same, improper, one-size-fits-all investment strategy across hundreds of its customers' accounts.

81.    As a result, Santander has faced hundreds upon hundreds of claims

from its customers and former customers relating to Puerto Rico Funds and Puerto Rican bonds.

82.    FINRA has sanctioned Santander for supervisory failures and actions related to Puerto Rican bonds and Puerto Rican CEFs, but customers like Claimant have not been made whole.

83.    The inappropriate and concentrated investment strategy recommended by Santander constitutes fraud, breach of fiduciary duty, negligence, violations of FINRA rules, industry standards, federal law, and Puerto Rico statutes, and further violates Santander's supervisory obligations.

84.    Plaintiff relied on Santander.

85.    Plaintiff sought Santander's advice and recommendations throughout the relationship.

86.    Santander has openly admitted as much, recognizing that Plaintiff was in constant communication with the account's financial consultant.

87.    By way of example, on or about December 28, 2012, Plaintiff sought Santander's advice in writing.

88.    On or about December 28, 2012, Plaintiff wrote to Hortensia Llavat and Santander and requested: "Favor de invertirlo en los Fondos Mutuos Conservadores como siempre."

89.    Plaintiff thus requested that Santander invest the portfolio in

"conservative mutual funds as always."

90.    Santander or its agent(s) received the December 28, 2012 letter from Plaintiff.

91.    Santander knew that Plaintiff desired conservative investments.

92.    Santander represented to Plaintiff that the Santander Funds did not carry significant risks.

93.    However, Santander knew that the Santander Funds it recommended to Plaintiff were not conservative investments.

94.    Santander further knew that a concentrated portfolio of the Santander Funds was not conservative.

95.    Santander significantly concentrated Plaintiff's portfolio in Santander Funds and Puerto Rican securities.

96.    Santander has openly admitted that an investment strategy was pursued within Plaintiff's accounts.

97.    Santander directed the investment strategy implemented in Plaintiff's accounts.

98.    Specifically, the Financial Advisor purchased or recommended holding securities such as the First Puerto Rico Tax Advantaged Target Maturity Fund I, First Puerto Rico Tax Advantaged Target Mat Fund II, and First Puerto Rico AAA Target Maturity Fund I, among others.

16

99.   The tax-advantaged status of the investments Santander recommended, however, did not justify the additional risk created by concentrated holdings that defied industry standards of asset allocation and diversification.

100.   Santander and its sales force aggressively recommended that its clients purchase shares in the Santander Funds.  In selling and soliciting the Funds, Santander and its sales force repeatedly emphasized the Santander Funds' safety, while it downplayed their risks.

101.   The Santander Funds were high-risk, leveraged bond funds potentially appropriate only for a small portion of any investor's account, and even then, only for investors who were willing to take on significant risks.

102.   However, Santander did not market the Santander Funds that way. Instead, Santander misrepresented the true risks associated with these investments, and represented the Santander Funds to clients as safe, secure, income-producing vehicles with little fluctuation and easy liquidity.  Of course, the lack of fluctuation was due, in large part, to the lack of any market-driven pricing. Santander routinely made such misrepresentations to its clients, including thousands of victims like Claimant.  Indeed, it is estimated that investors in the Santander Funds lost well over half a billion dollars.

103.   FINRA imposes strict requirements upon its members, and their associated persons, and requires, in the conduct of all business, that the member must

"observe high standards of commercial honor and just and equitable principles of trade."

104. FINRA rules also impose suitability obligations on Santander.

105. FINRA's suitability rules not only require that individual recommendations of securities be suitable, but that any recommended "investment strategy involving a security" be "suitable for the customer." *See* FINRA Rule 2111. The requirement that investment strategies be suitable is meant to be broad, and even covers recommendations of an investment strategy which contains non-security investments, in addition to securities.

106. Not only must initial recommendations of securities or investment strategies be suitable, but any recommendations to hold an investment must be suitable as well.

107. FINRA also places strict supervisory obligations on its members. FINRA Rule 3110 "requires a firm to establish and maintain a system to supervise the activities of its associated persons that is reasonably designed to achieve compliance with the applicable securities laws and regulations and FINRA rules."

108. Despite knowing of the concentration, Santander and its supervisory team failed to properly supervise Plaintiff's accounts or correct the improper recommendations.

109. As part of Santander's duties, Santander was required to recommend

18

appropriately allocated and diversified investment strategies, thereby limiting

Claimant's exposure to excess and inappropriate investment risk.

110.   FINRA has offered the following advice regarding the importance of

asset allocation and proper diversification in managing and reducing investment risk:

> [T]wo basic investment strategies can help manage both systemic risk (risk affecting the economy as a whole) and non-systemic risk (risks that affect a small part of the economy, or even a single company).

> - Asset Allocation. By including different asset classes in your portfolio (for example stocks, bonds, real estate and cash), you increase the probability that some of your investments will provide satisfactory returns even if others are flat or losing value. Put another way, you're reducing the risk of major losses that can result from over-emphasizing a single asset class, however resilient you might expect that class to be.

> - Diversification. When you diversify, you divide the money you've allocated to a particular asset class, such as stocks, among various categories of investments that belong to that asset class. Diversification, with its emphasis on variety, allows you to spread you[r] assets around. In short, you don't put all your investment eggs in one basket.

See,    FINRA,    "The    Reality    of    Investment    Risk,"

http://www.finra.org/investors/reality-investment-risk.

111.   FINRA advises regarding asset allocation:

> Put another way, [through proper asset allocation] you're reducing the risk of major losses that can result from over-emphasizing a single asset class, however resilient you might expect that class to be. This is especially true if your assets are "uncorrelated," meaning they react to economic events in ways independent of other assets in your portfolio. Stocks and bonds, for instance, often move in different directions from each other, which is why holding both of

these asset classes can help manage risk.

While you can recognize historical patterns that seem to indicate a strong period for a particular asset class or classes, the length and intensity of these cyclical patterns are not predictable. That's why it's important to have money in multiple asset classes at all times.

*See,* FINRA, "Key Investing Concepts: Asset Allocation," *http://www.finra.org/investors/asset-allocation.*

112.    FINRA Notice to Members 04-30, applicable to Santander and Llavat warns: "However, NASD reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer."

113.    Even after 2013, Santander continued to recommend and endorse the investment strategy to Plaintiff.

114.    Even after 2013, Santander continued to suggest that Plaintiff continue to hold the investments and wait to see what happened.

115.    Plaintiff's relationship with Santander and Llavat continued until at least 2018.

116.    Throughout the entirety of the relationship, Santander and Llavat never appropriately diversified the portfolio or disclosed the full or true nature of the risks Santander was aware of.

117.    Santander continuously violated the rules, regulations, standards, and duties owed to Plaintiff throughout the relationship with Plaintiff.

118.   Llavat ultimately filed a claim against Santander Securities.

119.   Llavat's claim was filed in FINRA Arbitration, FINRA Case No. 18-04145.

120.   While Plaintiff does not have a copy of Llavat's claims against Santander, other Financial Advisors who have asserted claims against the creators of proprietary Puerto Rico Funds have alleged that the firms fraudulently maintained a conflict of interest, concealed the conflict from clients and the agents and financial advisors, and created a high-pressure environment to induce the advisors to sell more of the funds, among other allegations of wrongdoing.

121.   On information and belief, Llavat is just one of the current or former Santander agents who have asserted claims against Santander.

122.   Prudent investment management requires that securities portfolios be diversified because diversification reduces risk without reducing expected returns. Principles of diversification enable an investment portfolio to take maximum advantage of market conditions in specific sectors and to protect against downturns in one particular sector.

123.   When a portfolio is concentrated in a specific security, or even a specific sector or geographic region, the value of the portfolio can drop sharply if that sector or region experiences a general downturn. If the portfolio, however, is composed of multiple securities across multiple sectors and geographic regions,

some may go down in value while others may remain stable or go up. Different types of fixed income categories will generally not lose value at the same rate or at the same time.

124.  Correlation is an industry standard that measures how different securities move in tandem. A diversified portfolio should consist of a portfolio of securities that do not move in unison. Two securities that are perfectly correlated is a 1. Two securities that are perfectly inversely correlated is -1. Two securities that have no correlation is 0 – often referred to as low correlation.

125.  Modern Portfolio Theory ("MPT"), the industry standard for prudent portfolio management for over twenty years, employs the use of correlations for identifying categories and sectors that are loosely correlated and do not move in tandem. Creating a diversified portfolio of fixed income securities from multiple sectors and sub-sectors, and multiple categories, which have low correlations, is the foundation of MPT.

126.  Financial professionals generally assert that asset allocation is the most important determinant of variability of returns, accounting for more than 90 percent of the differences in performance across portfolios. This assertion stems from the well-known studies by Brinson, Hood, and Beebower which state, "…investment policy dominates investment strategy (market timing and security selection),

explaining on average 93.6 percent of the variation in total plan return."[3]  In simple terms, asset allocation is simply the mix of stocks, bonds, cash, and other investments in a portfolio.

127.   Fiduciaries have the duty to investigate alternative investments to determine if other investments are available which might deliver appropriate benefits for less risk.

128.   Fiduciaries have the duty to select prudent investments and the duty to diversify from the outset, and a continuing duty separate and apart from the duty to exercise prudence in selecting investments at the outset  to monitor trust investments and remove imprudent ones.

129.   During the relevant time period, Defendant, through its agents, selected the investments for the Plan and directed the allocation of the Plan assets to those investments. Defendant, through its agents, also directed all changes in Plan investments and allocation among those investments during the relevant time period.

130.   Defendant improperly allocated and managed the Plan. Defendant failed to prudently invest the Plan, failed to diversify Plan investments, and failed to properly monitor and remove inappropriate holdings.

131.   The portfolio Defendant recommended performed radically different

---

[3] Ibbotson Associates, ed. Stocks, Bonds, Bills, and Inflation 2005 Yearbook. Chicago: Ibbotson Associates, 2005.

from essentially every generally accepted investment benchmark. Plaintiff's portfolio grossly underperformed virtually every recognized benchmark during the time period from 2012 to the present.

132.   Defendant knew at the time they recommended these investments how poorly diversified and allocated they were. The portfolio allocations selected by Defendant otherwise failed to comply with prudent investment standards.

133.   Defendant knew or should have known that in taking such significant risks they were not acting in the best interest Plaintiff.

134.   Defendant either intentionally concentrated the Plan's assets in

135.   Defendant was not reasonably prudent in researching and understanding the risks of investments or even understanding or applying basic investment principles such as asset allocation and diversification. Defendant further failed to conduct adequate due diligence on the securities held within the portfolio. Defendant additionally failed to monitor and remove imprudent investments.

136.   As a result of Defendant's actions, Plaintiff suffered significant losses. In particular, Plaintiff suffered estimated losses in excess of $125,000, as measured by a 30% Stock / 70% Bond Portfolio of Well-Managed or Market-Adjusted Damages. Estimated damages compared to a 40% Stock / 60% bond benchmark exceed $155,000, and estimated damages compared to a 60% stock / 40% bond benchmark exceed $219,000.

24

## COUNT I: BREACH OF CONTRACT

137.   Plaintiff realleges and incorporate by reference paragraphs 1-135 as if set forth fully herein.

138.   Plaintiff and Defendant had contracts and agreements directly with one another.

139.   Defendant and FINRA also had contracts and agreements.

140.   Plaintiff, like other customers of FINRA Members, was an intended third party beneficiary to Defendant's contracts and agreements with FINRA.

141.   As part of Defendant's agreement with Plaintiff, Defendant agreed to be subject to the rules and customs of the exchange or market

142.   As part of Defendant's agreement with Plaintiff, Defendant agreed to be subject to the constitution, rules, regulations, customs, usages, rulings and interpretations of the exchange or market and the clearing facility, the Financial Industry Regulatory Authority (FINRA) and to all applicable laws and regulations.

143.   As part of Defendant's agreement with Plaintiff, Defendant agreed to be subject to the provisions of any applicable statute, rule, or regulation.

144.   Defendant's agreement with Plaintiff and its provisions were intended to be continuous.

145.   Santander has previously argued that Plaintiff is bound by the terms and conditions in the Firm's account documents.

146.    Santander separately entered into a membership agreement with FINRA.

147.    As part of the membership agreement, Santander certified that it would comply with the various securities rules and regulations, as well as maintain high standards of commercial honor and just and equitable principles of trade.

148.    Santander also agreed to follow the rules and regulations of the OCIF in Puerto Rico.

149.    Santander breached all of these contracts and agreements, violating the duties, regulations, laws, customs, and the general duty of good faith and fair dealing throughout its relationship with Plaintiff.

150.    As a result of those breaches by Defendant, Plaintiff suffered significant damages and losses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for relief as follows:

A.    Compensatory Damages, including but not limited to in the Form of Well-Managed or Market Adjusted Damages in excess of $125,000.

B.    An amount equal to the amount of any losses, including lost opportunity costs and lost profits, to the Plaintiff and the Plan;

C.    An award of costs to make Plaintiff whole;

D.   An award of attorneys' fees to make Plaintiff whole;

E.   An award of such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 20, 2020

S. *John F. Nevares, Esq.*
JOHN F. NEVARES & ASSOCIATES
ATTORNEYS AT LAW
VIG Tower
1225 Ave Juan Ponce De León
San Juan, PR 00907
Telephone: (787) 722-9333
Fax: (787) 721-8820

*Of Counsel*
*S. Michael C. Bixby, Esq.*
LEVIN, PAPANTONIO, THOMAS
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502-5996
Telephone: (850) 435-7068
Facsimile: (850) 436-6068
*Pro Hac Vice to be Filed*

***Attorneys for Plaintiffs***